IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| RAPHAEL HALL,<br><br>  Plaintiff,<br><br>  v.<br><br>BOARD OF REGENTS FOR THE<br>UNIVERSITY SYSTEM OF GEORGIA,<br><br>  Defendant. | CIVIL ACTION NO.: 4:21-cv-148 |

## **O R D E R**

Plaintiff Raphael Hall brought this action against Defendant Board of Regents for the University System of Georgia ("Board of Regents"), under Title VII of the Civil Rights Act of 1974, 42 U.S.C. § 2000e, *et seq.*, alleging, *inter alia*, that he was terminated from his employment as a police officer for Savannah State University ("SSU") because of his involvement in the investigation of sexual harassment complaints lodged by three female officers against James Barnwell, former Chief of the SSU Police Department ("SSUPD"). (Doc. 1.) Presently before the Court is Defendant's Motion for Summary Judgment, (doc. 29), in which it argues, *inter alia*, that Plaintiff has failed to establish a prima facie claim of retaliation under Title VII, (doc. 29-1). Plaintiff filed a Response, (doc. 37), and Defendant filed a Reply, (doc. 41). For the reasons set forth below, the Court **DENIES** Defendant's Motion for Summary Judgment. (Doc. 29.)

## BACKGROUND

**I.      Plaintiff's Employment at Savannah State University**

Plaintiff was previously employed as an officer at the SSUPD, holding the rank of Captain. (Doc. 37-3, p. 1; doc. 37-1, p. 1.)  In February or March 2018, two female police officers[1] approached Plaintiff and told him that they were being mistreated and sexually harassed by James Barnwell, who at the time served as the Chief of Police of the SSUPD.  (Doc. 37-3, p. 1; doc. 37-1, pp. 1–2.)  After hearing the female officers' complaints, Plaintiff advised them to seek assistance from the SSU Legal Office.  (Doc. 37-3, pp. 1–2; doc. 37-1, p. 2.)  The same two female officers and one additional female officer thereafter filed internal complaints with Defendant and SSU, alleging that they were the victims of sexual harassment from Barnwell.  (Doc. 37-3, p. 2.) According to Plaintiff, after filing their complaints, the same two female officers returned to speak with him, and they told him they did not believe SSU was properly pursuing their complaints. (Doc. 37-3, pp. 1–2; doc. 37-1, p. 2.)  Plaintiff claims that he then advised them to retain outside counsel to assist them in the complaint process.  (Doc. 37-3, pp. 1–2; doc. 37-1, p. 2.)

Following the women's reports, Defendant began an investigation into the alleged sexual misconduct of Chief Barnwell.  (Doc. 37-3, p. 2.)  During the investigation, Barnwell accused Plaintiff and another SSU officer, Lieutenant Lawrence Brown, of instigating the complaint and investigation process to avoid discipline for their allegedly poor performance.  (Id. at pp. 2–3.) Chief Barnwell was placed on administrative leave while the investigation was ongoing.  (Doc. 37-3, p. 3.)  According to Plaintiff, Deputy Chief Keith Hayes, at the instruction of then Vice

---

[1] There were a total of three women who lodged complaints against Barnwell: Sophia Fitzpatrick, Panei McKinnon, and Areathia Castro.  There is a slight dispute of fact as to whether Plaintiff was approached by all three women, as he contends in his declaration, (see 37-1, p. 1), or just by McKinnon and Fitzpatrick, as Defendant states in its Statement of Material Facts, and as Plaintiff admits in his Response, (doc. 37-3, p. 1).  This discrepancy, however, is immaterial to the Court's ruling.

2

President of Fiscal Affairs for SSU, Edward B. Jolley, ordered Plaintiff to cease communications with the one of the female officers, Officer Fitzpatrick. (Doc. 37-1, p. 3.)

Plaintiff and Brown were both interviewed within the course of the investigation and were asked directly about whether they had encouraged the female officers to file the complaints against Barnwell. (Doc. 37-3, p. 3.) Plaintiff responded that he would have instructed the officers about the reporting process and resources available to them, and he additionally shared with the investigator that he believed that Barnwell had acted inappropriately towards the women. (Id.; doc. 37-1, pp. 3–4.) He further told the investigator that he had advised the women to seek legal counsel and was concerned he would be retaliated against for his role in advising them. (Doc. 37-3, p. 3; doc. 37-1, p. 4.)

Beginning in April 2018, both Plaintiff and Brown testified to having conversations with Major Brian Lawton (who was acting as SSUPD Interim Chief) and Hayes. (Doc. 37-1, p. 4; doc. 37-2, p. 4.) In these conversations, Plaintiff and Brown explained their involvement in the investigation of Barnwell and expressed their concern that they would be retaliated against for their role in advising the female officers. (Doc. 37-1, p. 4; doc. 37-2, p. 4.) Plaintiff and Brown additionally testified that they had previously had discussions with both Hayes and Lawton about the accusations Barnwell was lodging against him. (Doc. 37-1, p. 4; doc. 37-2, p. 4.)

In early April 2018, Jolley called an emergency command meeting of the public safety department, which included the SSUPD. (Doc. 37-1, p. 3; doc. 37-2, p. 3.) In attendance at the meeting were Jolley, Hayes, Lawton, Lieutenant Fredrick Denson, Brown, and Plaintiff. (Doc. 37-1, p. 3; doc. 37-2, p. 3.) Plaintiff and Brown testified that, during the meeting, Jolley stated, "As you know, Chief Barnwell is on leave, but he will be coming back, he will be a little bruised, but we were making great strides under his command." (Doc. 37-1, p. 3; doc. 37-2, p. 3.)

3

Thereafter, according to Plaintiff and Brown, Jolley slapped the conference table and stated, "When he returns, we going [sic] to reconstruct this department." (Doc. 37-1, p. 3; doc. 37-2, p. 3.) Plaintiff and Brown both testified that Jolley was looking directly at them when he made this statement. (Doc. 37-1, p. 3; doc. 37-2, p. 3.)

Barnwell's investigation concluded and, on May 23, 2018, he was terminated as Chief of Police. (Doc. 37-3, p. 4.) Barnwell was replaced by Chief Bryant, who, according to Brown, was friends with Barnwell. (Doc. 29-2, p. 38.)

## II.   Department Restructure

In April 2017, the University System announced a system-wide initiative called the Comprehensive Administrative Review ("CAR"), which was an effort to streamline processes and use resources more effectively. (Doc. 37-3, p. 4.) At some point in Spring 2018, SSU began its CAR initiative as well as a Reduction in Force ("RIF") initiative. (Doc. 37-3, p. 4; doc. 29-4, p. 68.) The RIF was a university-wide initiative, with each department making its own individualized assessments and recommendations. (Doc. 37-3, p. 8; doc. 29-5, pp. 26–27.) Plaintiff testified that he first heard about the RIF when Barnwell was placed on leave in the spring of 2018, specifically around the time Jolley called the emergency meeting. (Doc. 29-3, p. 54.) In June 2018, Lawton conducted an organizational review of the SSUPD as part of the RIF initiative. (Doc. 37-3, pp. 4–5.) Lawton, together with Bryant, submitted recommendations for the restructure, which recommended that the SSUPD be restructured to eliminate the positions of "Lieutenant" (held by Brown and Denson) and "Captain" (held by Plaintiff), and, in their place, create a new position of "Major."[2] (Doc. 29-5, pp. 120–26; doc. 37-3, p. 5.) The recommendation report outlines the reasons for the restructure as "address[ing] challenges facing administration with current staffing

---

[2] According to Plaintiff and Brown, Hayes was also involved in making the recommendation to remove their positions. (Doc. 37-3, p. 5; doc. 29-3, pp. 61–62, 40–41.)

4

issues/morale in a period of fiscal constraints, while recognizing the demands for cost containment, public perception[,] and accountability.  Simply put, we must ensure that we have the right people in the right seats." (Doc. 29-5, p. 121.)

This recommendation was ultimately adopted, and Plaintiff and Brown's positions were eliminated. (Doc. 37-3, pp. 6–7.)  While Plaintiff and Brown both reapplied for the Major position, the job was ultimately given to Denson, which entitled him to a raise and no loss of service time. (Doc. 37-3, p. 8; doc. 29-5, p. 50.)  Plaintiff and Brown were terminated on July 15, 2019, and neither was rehired by SSU.[3]  (Doc. 29-4, p. 68; 29-2, pp. 52–57; 29-3, pp. 63–73.)

### III.  Procedural History

Plaintiff filed a Charge of discrimination with the EEOC on October 11, 2019.  (Doc. 1, p. 5.)  On February 12, 2021, the EEOC issued Plaintiff a Notice of Right to Sue with respect to his Charge, allowing him to bring a lawsuit based on his allegations within ninety days.  (Id. at pp. 9–10.)  Plaintiff timely initiated this action on May 12, 2021.  (Id.)  Plaintiff alleges retaliation in violation of Title VII based on his termination following his participation in the investigation of Barnwell's sexual harassment and his opposition to such sexual harassment.  (See doc. 12 (Amended Complaint).)  Plaintiff prays for, among other relief, actual, compensatory, and punitive damages, as well as attorneys' fees and costs.  (Id. at p. 9.)

The parties engaged in discovery, and, on September 15, 2022, Defendant filed the at-issue Motion for Summary Judgment.  (Doc. 29.)  Plaintiff thereafter filed a Response, (doc. 37), and Defendant filed a Reply, (doc. 41).

---

[3]  While Plaintiff and Brown's positions were eliminated within SSUPD, Lawton's report also recommended the hiring of lower-level officers, but noted it was likely not feasible due to financial constraints. (Doc. 29-5, p. 124.)  While the exact recommendation for these additional lower-level positions was not implemented, according to Chief Human Resources Officer Jacqueline Stepherson, additional officers were eventually hired in the restructuring.  (Doc. 29-5, p. 27.)

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). Thus, the Court will view the record and all reasonable inferences that can be drawn

6

therefrom in Plaintiff's favor. However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (citation and emphasis omitted).

## DISCUSSION

### I. Plaintiff Has Made a Prima Facie Case of Retaliation

Title VII prohibits employers from discriminating against an employee because he "opposed . . an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). In order to establish a prima facie case for retaliation under Title VII, a plaintiff generally must show that (1) he engaged in statutorily protected activity; (2) he suffered the type of materially adverse action that would dissuade a reasonable employee from engaging in the statutorily protected activity; and (3) there was a causal relationship between the events. Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 57 (2006); Crawford v. Carroll, 529 F.3d 961, 970 (11th Cir. 2008).

Defendant argues that it is entitled to summary judgment in its favor because Plaintiff cannot succeed in establishing a prima facie case of retaliation. As a preliminary matter, there is no dispute that Plaintiff suffered an adverse employment action when he was terminated. (See generally docs. 29-1, 37, 41.) Instead, Defendant argues that Plaintiff cannot establish a prima facie case because (1) he did not engage in statutorily protected activity, and (2) there is no causal relationship between Plaintiff's dismissal and the alleged protected activity. (See doc. 29-1, pp. 3–9.)

### A. Plaintiff Has Made a Prima Facie Case that He Was Engaged in Protected Activity.

Defendant first contends that Plaintiff cannot make a prima facie case for retaliation because he has failed to show that he was engaged in protected activity. (Doc. 29-1, pp. 4–5.) As previously noted, under Title VII an employee is protected from discrimination if "he has opposed any practice made an unlawful employment practice by this subchapter," or if "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. §2000e-3(a). Courts have recognized these two designations as the "opposition clause" and the "participation clause," respectively. See Crawford v. Metro. Gov't of Nashville & Davidson Cnty., 555 U.S. 271, 274 (2009).

In the Amended Complaint, Plaintiff alleges that his termination was undertaken in retaliation for both his "*participating* in an investigation of sexual harassment under Title VII and for his *opposition* to such sexual harassment." (Doc. 12, p. 8 (emphasis added).) In its Motion for Summary Judgment, however, Defendant only addresses Plaintiff's ability to show that he engaged in protected activity using the participation clause. (See doc. 29-1, pp. 4–5.) It argues that because Plaintiff merely participated in Defendant's internal investigation, Plaintiff has no Title VII claim under the Eleventh Circuit Court of Appeals' reading of the participation clause. (Id.) Defendant is correct in this respect. The Eleventh Circuit has defined the limits of the participation clause, holding that it only "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC." E.E.O.C. v. Total System Servs., Inc., 221 F.3d 1171, 1174 (11th Cir. 2000). As Defendant argues, Plaintiff's claim is largely premised on retaliation for his participation in SSUPD's internal investigation of Chief Barnwell, not on retaliation for his participation in an investigation tied to a

8

formal EEOC charge. In his Response, Plaintiff offers no argument to counter this Eleventh Circuit precedent. (See generally doc. 37.) Instead, Plaintiff points to sufficient facts to support a determination that he has satisfied the "opposition clause" of 42 U.S.C. § 2000e-3(a).[4]

The precise requirements for an action to qualify as "opposition" are not clearly delineated in the statute, but the United States Supreme Court has broadly construed the clause's limits. Crawford v. Metro. Gov't of Nashville & Davidson Cnty., 555 U.S. 271, 277–78 (2009). As a general rule "[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." Id. at 276. Additionally, there is no requirement that the discriminatory practice opposed by the plaintiff be directed at the plaintiff himself. See Tucker v. Talladega City Schs., 171 F. App'x 289, 295 (11th Cir. 2006) (per curiam). Moreover, an employee can still be found to be "opposing" a practice within the definition of the clause even if they do not lodge a complaint against an employer and merely respond to questions in ways that allow their opposition to be known within the course of an internal investigation. Crawford, 555 U.S. at 277–78. Indeed, the Eleventh Circuit, relying on Crawford, has further clarified that "Title VII protects an employee who testifies about unlawful conduct in an internal investigation." Sridej v. Brown, 361 F. App'x 31, 35 (11th Cir. 2010).

Here, as Plaintiff argues in his Response, he "did not just participate in an internal investigation; he *actively opposed* unlawful discrimination." (Doc. 37, p. 13 (emphasis added).)

---

[4] To the extent Plaintiff may still wish to rely on his own EEOC charge to fit within the participation clause, the record reflects that Plaintiff was officially terminated in July of 2019 but and did not file his Charge with the EEOC until October 11, 2019. (Doc. 1, p. 5; doc. 29-3, p. 13; doc. 29-4, p. 68.) "Because no EEOC complaint had been filed before Plaintiff's termination, Plaintiff's involvement . . . in Defendant's internal investigation did not constitute protected expression under the participation clause of Title VII." See Gordon v. Ocala Auto. Mgmt., LLC., No. 5:07-CV-505-OC-GRJ, 2009 WL 129616, at *5 (M.D. Fla. Jan. 20, 2009).

Plaintiff testified that he advised the female officers to file complaints against Barnwell within SSUPD and, when the female officers expressed to him their dissatisfaction with the department's handling of their complaints, he then instructed them to seek outside counsel. (Doc. 37-1, p. 3.) Plaintiff further contends that he let this opposition be known to the investigator within the course of Defendant's investigation. According to his testimony, he told the investigator what the female officers reported to him, and he also disclosed that he had advised the women to file complaints and retain outside counsel. (Doc. 37, p. 5; Doc. 37-3, p. 3; doc. 37-1, p. 4.) Moreover, he specifically conveyed to the investigator that he "believed Barnwell had acted inappropriately towards [the women]." (Doc. 37-1, pp. 3–4.) Under this version of events, Plaintiff indicated that he believed not only that Barnwell had committed some sort of sexual harassment but also that he believed action against Barnwell should be taken as a result. Finally, Plaintiff directly voiced his concerns to both Lawton and Hayes that he would be retaliated against for his role in advising the female officers to report Barnwell. (Doc. 37-1, p. 4.)

These words and deeds constitute sufficient opposition under the Supreme Court's definition of the clause. See Crawford, 555 U.S. at 276 (finding that the plaintiff's providing an "ostensibly disapproving account" of sexual harassment by her employer was sufficiently "resistant or antagonistic" to fall with the opposition clause); see also Demers v. Adams Homes of Nw. Fla., Inc., 321 F. App'x 847, 852 (11th Cir. 2009) ("[T]he employee must . . . at the very least, communicate [his] belief that discrimination is occurring to the employer, and [not] rely on the employer to infer that discrimination has occurred.") (internal quotations omitted); Powell v. Burger Docs Atlanta, Inc., No. 1:19-CV-3808-MLB, 2021 WL 4192864, at *8 (N.D. Ga. Sept. 14, 2021) (providing information and offering to write a report about an alleged sexual assault within the course of an internal investigation was sufficient opposition within Crawford's definition);

Gordon, 2009 WL 129616, at *1, *5 (finding plaintiff engaged in protected activity where he encouraged his coworker to file a sexual harassment complaint); cf. Fields v. Locke Lord Bissell & Liddell LLP, No. CIVA 1:07-CV-2984TWT, 2009 WL 2341981, at *17 (N.D. Ga. July 28, 2009) ("[H]ad [the plaintiff] made any complaint of discrimination, or otherwise indicated that she opposed some act of alleged discrimination, then such a statement could be considered a protected activity under Title VII despite the fact that Plaintiff herself did not initiate or instigate the complaint that triggered the investigation."). Accordingly, the Court finds that Plaintiff has provided sufficient evidence that he engaged in statutorily protected activity by opposing the at-issue alleged sexual harassment.

  **B. Plaintiff Has Pointed to Sufficient Evidence of a Causal Relationship Between His Protected Activity and His Termination.**

Defendant next contends that Plaintiff cannot make a prima facie case of discrimination because, even if he was engaged in statutorily protected conduct, he cannot show that this conduct caused the adverse employment action. (Doc. 29-1, pp. 5–9.) To establish the requisite causal connection, a plaintiff must, at a minimum, show that "the decisionmaker[s] [were] aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." McCann v. Tillman, 526 F.3d 1370, 1376 (11th Cir. 2008) (alterations in original); see also Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001) (stating that "the causal link element is construed broadly"). A plaintiff can demonstrate that the protected activity and the adverse action are not wholly unrelated by simply showing "that the decision maker was aware of the protected conduct at the time of the adverse employment action." Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000). The decision maker's awareness of the protected conduct is critical because "[a] decision maker cannot have been motivated to retaliate by something unknown to him." Id. This awareness may be established by temporal

11

proximity and other circumstantial evidence. See Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir.1993).

Generally, "close temporal proximity between an employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." Brungart, 231 F.3d at 799; see Williams v. Waste Mgmt., Inc., 411 F. App'x 226, 229 (11th Cir. 2011) (finding a causal connection "may be inferred by close temporal proximity between the protected activity and the adverse employment action"). While there is no exact period of time which establishes causation, it is clear that "mere temporal proximity," without additional evidence of causation, "must be very close." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (internal quotations omitted). Indeed, the Eleventh Circuit has clarified that generally the adverse employment action must have occurred within a few months of the alleged protected activity absent other circumstantial evidence. See, e.g., Donnellon v. Fruehauf Corp., 794 F.2d 598, 601 (11th Cir. 1986) ("The short period of time [(one month)] . . . between the filing of the discrimination complaint and the plaintiff's discharge belies any assertion by the defendant that the plaintiff failed to prove causation."); Wascura v. City of S. Miami, 257 F.3d 1238, 1248 (11th Cir. 2001) (holding that, by itself, the over three month period between protected activity and adverse action was insufficient to prove causation); Higdon v. Jackson, 393 F.3d 1211, 1221 (11th Cir. 2004) ("By itself, the three month period . . . does not allow a reasonable inference of a causal relation between the protected expression and the adverse action."); Herron-Williams v. Ala. State Univ., 805 F. App'x 622, 632 (11th Cir. 2020) (per curiam) (finding that the plaintiff failed to establish a causal connection where "at least two months had passed" between the employer's knowledge of the protected activity and the adverse action, and plaintiff failed to identify additional evidence to connect the events); Clemons v. Delta Air Lines Inc., 625 F. App'x

941, 945 (11th Cir. 2015) (finding that a period of four months, with no further evidence that anyone involved in the termination was aware of the protected conduct, was insufficient to establish causation). However, the length of time may be greater when the plaintiff offers evidence that the decision maker was aware of the plaintiff's protected conduct. See, e.g., Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1461 (11th Cir. 1998) (finding, in a case where there was a five-to-six-month gap between the protected conduct and the adverse action, that circumstantial evidence showing the decisionmaker's awareness of the plaintiff's protected conduct was sufficient for a jury to find causation).

Here, Defendant argues that the time that elapsed between the protected activity and the adverse employment action is too great and thus does not provide evidence of a causal connection. (Doc. 29-1, pp. 7–9; doc. 41, pp. 3–4.) Defendant points out that Plaintiff first spoke with the sexual harassment complainants in February or March of 2018, yet Plaintiff was not dismissed from his position until July 2019. (Doc. 29-1, p. 7; doc. 41, p. 4.) According to Defendant, this defeats Plaintiff's claim of causation. (Doc. 29-1, p. 7; doc. 41, p. 4.)

Plaintiff, however, provides a different version of events to show temporal proximity. While he admits that he was not formally dismissed until July 2019, he contends that the decision to restructure the department, and remove him from his position, occurred much sooner. (Doc. 37, pp. 15–16.) Beginning in April 2018, both Plaintiff and Brown began to voice their concerns to Lawton regarding their participation in the Barnwell investigation. (Doc. 37-1, p. 4; doc. 37-2, p. 4.) Lawton ultimately recommended that the positions held by Plaintiff and Brown be eliminated in June 2018.[5] (Doc. 37-3, pp. 4–5; 29-5, pp. 120–26.) While Plaintiff has not specified the exact

---

[5] While the parties did not brief the matter, the Court notes that, as a general rule, a low-level recommendation to a final decisionmaker can suffice to show the retaliatory act. Williamson v. Adventist Health Sys./Sunbelt, Inc., 372 F. App'x 936, 938 (11th Cir. 2010) (per curiam). The Eleventh Circuit has described this as the "cat's paw theory," which applies "when a biased actor recommends that an adverse

13

timeline of his and Brown's ongoing discussions with Lawton,[6] at most this would be a two-month period as opposed to the sixteen-month period advanced by Defendant. (Doc. 29-1, p. 7.)

While the Court would be reluctant to find that a two-month period is, by itself, sufficient to establish causation, see, e.g., Windham v. Barr, No. 5:16-cv-83, 2019 WL 1412119, at *13 (S.D. Ga. Mar. 28, 2019) (finding that a period of approximately two months "alone is not sufficient to establish a prima facie retaliation case"), here, Plaintiff does not rely solely upon temporal proximity to establish the necessary causality between his protected conduct and termination. Indeed, temporal proximity is just one path to establishing this awareness, and the decisionmaker's awareness of the employee's protected activity may be established by additional circumstantial evidence. City of Atmore, 996 F.2d at 1163. Beyond the two-month period, Plaintiff has shown additional circumstantial evidence in the record indicating that Lawton was aware of Plaintiff's engagement in protected conduct when he made the recommendation to eliminate Plaintiff's position at the SSUPD. (See doc. 37, pp. 15–17.)

Defendant argues that Plaintiff cannot show that the decisionmakers[7] were "aware of his communications with the sexual harassment complainants or with his interview with the . . .

---

employment action be taken against an employee, but the biased actor is not the ultimate decision-maker." Id. (citing Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1331 (11th Cir. 1999) (per curiam)). Plaintiff's theory here clearly advances the idea that Lawton (and Hayes) were biased against Plaintiff and Brown for their participation in the Barnwell investigation, and that Defendant simply accepted their recommendation to eliminate their positions.

[6] In his Response, Plaintiff claims that Lawton and Hayes "made the recommendation to eliminate Plaintiff's position within one month of the conclusion of the investigation and termination of Barnwell." (Doc. 37, pp. 15–16.) This presumably is what Plaintiff relies on when he asserts that the adverse action occurred within "less than a month" of the protected conduct. (Id. at p. 15.) However, Plaintiff has not explained how Barnwell's termination equates to Plaintiff engaging in protected conduct, and thus the Court cannot say that the protected activity occurred within a month of the adverse action.

[7] Notably, Defendant seemingly acknowledges Lawton's role as a decisionmaker in the case, noting that he made "[d]irect recommendations" to an SSU administrative group, and that "Plaintiff cannot show that these individuals were aware of any protected activity." (Doc. 29-1, p. 8.) Defendant's use of "these individuals" in this context appears to apply to all of the individuals referenced in the sentence, including

investigator who was investigating the complaints." (Doc. 29-1, p. 8.) In Response, Plaintiff points to Plaintiff and Brown's sworn testimony that, "[b]*eginning* in April 2018," they directly voiced their concerns to Lawton and Hayes[8] regarding their involvement in Barnwell's investigation and their fear that they would ultimately suffer retaliation. (Doc. 37, p. 17; see doc. 37-1, p. 4 (emphasis added); doc. 37-2, p. 4.) Plaintiff also cites to his and Brown's testimony that, based on conversations they had with Lawton and Hayes prior to Barnwell's termination, it was evidenced that "[b]oth Lawton and Hayes were aware that Barnwell had accused [Plaintiff and Brown] of putting the women up to complaining about him."[9] (Doc. 37, p. 7 (citing doc. 37-1, p. 4; doc. 37-2, p. 4).) Indeed, Plaintiff testified that it was Hayes who instructed him to cease communications with the female complainant, which, when viewed in the light most favorable to Plaintiff, demonstrates that Hayes was aware of Plaintiff's involvement in the filing of the complaints. (See doc. 37-1, p. 3.) Plaintiff further notes that Lawton and Hayes attended the meeting regarding restructuring the SSUPD and Barnwell's anticipated return, the same meeting where both Plaintiff and Brown perceived Jolley's comments regarding restructuring to be specifically targeted at them. (See doc. 29-2, pp. 31–32; doc. 29-3, pp. 55–57); see Olmsted, 141 F.3d at 1461 (finding that testimony that the decisionmaker was in a meeting with a manager who said the plaintiff "wasn't going to be with the company much longer in the future," provided

---

the administrative group as well as Lawton. (Id.) Defendant neglected to deny or clarify this point in its Reply brief. (See generally doc. 41.)

[8]  Plaintiff contends that Hayes was involved with Lawton in making the restructuring decision that eliminated Plaintiff and Brown's positions. (Doc. 37-3, p. 5.) Plaintiff testified that together Bryant, Hayes, and Lawton were collectively decision makers in the RIF, (doc. 29-3, pp. 40–41), which has not been disputed by Defendant, (see generally docs. 29-1, 41).

[9]  Indeed, Plaintiff, in his sworn deposition testimony, further stated that, when he first approached Lawton to express his fear of being retaliated against, Lawton seemed "uneasy, started getting loud[,] and then put the blame elsewhere." (Doc. 29-3, p. 41.)

15

circumstantial evidence that the decisionmaker may have been influenced by others with knowledge of the plaintiff's complaints).

Considering all of this evidence together, the Court finds that Plaintiff has made an adequate showing of causation. Specifically, Plaintiff has provided that when Lawton and Hayes recommended that Plaintiff's position be eliminated, they were aware of Plaintiff's recent engagement in protected activity—that being his opposition to Barnwell's sexual harassment through his through his involvement with the female officers' complaints of sexual harassment and his provision of advice to the female officers concerning their allegations.

**II.     Plaintiff Has Pointed to Sufficient Evidence that Defendant's Stated Reason for Terminating Him (i.e., the Reduction in Force) Was a Pretext for Retaliation**

Once a plaintiff succeeds in establishing a prima facie claim of retaliation under Title VII, the burden shifts to the defendant, who then "has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action."  Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001). If the employer is able to show a legitimate, non-discriminatory reason for the challenged employment action, the burden then shifts back to the plaintiff to prove, "by a preponderance of the evidence[,] that the reason provided by the employer is a pretext for prohibited, retaliatory conduct." Id.

Here, Defendant argues that Plaintiff's dismissal was merely a result of the broader RIF "that took place across all institutions within the Board of Regents," and thus cannot be found to be retaliatory. (Doc. 29-1, p. 6.) Defendant correctly contends that, generally, "a reduction in force is a legitimate non-discriminatory reason for the termination of an employee." (Id. (citing EEOC v. McPherson Cos., 914 F. Supp. 2d 1234 (N.D. Ala. Nov. 14, 2012)); see Chavez v. URS Fed. Tech. Servs., Inc., 504 F. App'x 819, 821 (11th Cir. 2013) ("[The defendant]. . . satisfied its burden of articulating a legitimate, nondiscriminatory reason for firing [the plaintiff]: a reduction-

in-force due to budget cuts."). Thus, the burden shifts back to Plaintiff to show that Defendant's reason was merely pretextual.

For Plaintiff to succeed on a showing of pretext, the Court must "determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997). A plaintiff may do so by showing enough "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Id. Moreover, a plaintiff will also survive summary judgment if they can present "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination" by the employer. Calvert v. Doe, 648 F. App'x 925, 929 (11th Cir. 2016). The Court finds that Plaintiff has met this burden.

Plaintiff has provided numerous bases for finding that Defendant's decision to eliminate Plaintiff and Brown's positions was a pretext for retaliating against him for his role in Barnwell's investigation and termination.[10] Plaintiff and Brown were subject to scrutiny in Barnwell's investigation—they were both told to cease communications with the female complainants and were subsequently interviewed regarding their involvement in advising the female complainants—and they were the only employees in the SSUPD who subsequently lost their jobs. (Doc. 29-4, pp. 71–72.) Plaintiff and Brown both testified that Jolley, in the April 8, 2018, meeting, implied that Plaintiff and Brown's jobs would be eliminated when discussing restructuring the department, and that the very officers who recommended their termination—Lawton and Hayes—were present in

---

[10] Plaintiff's proffered evidence of pretext was largely already addressed in the Court's analysis of causation. See Discussion Section I.B, supra. "In order to establish pretext, the plaintiff is not required to introduce evidence beyond that already offered to establish the prima facie case." Combs, 106 F.3d at 1530.

17

that meeting. (Doc. 29-2, pp. 31–32; doc. 29-3, pp. 55–57.) Additionally, Barnwell had accused Plaintiff and Brown of encouraging the female officers to file complaints and instigating the investigation, which Plaintiff discussed with both Lawton and Hayes. (Doc. 37-3, pp. 2–3; doc. 37-1, p. 4; doc. 37-2, p. 4.) Barnwell was subsequently replaced by Bryant, who Brown described to be Barnwell's friend. (Doc. 29-2, p. 38.) Moreover, both Plaintiff and Brown felt that because they voiced their concerns about Barnwell, their jobs were in jeopardy, and they disclosed this to both Hayes and Lawton, who would, shortly thereafter, go on to recommend their termination. (Doc. 37-1, p. 4; doc. 37-2, p. 4.) In sum, Plaintiff has provided a "convincing mosaic" of circumstantial evidence that he was specifically retaliated against because of his involvement in Barnwell's dismissal: he and Brown advised the female officers in lodging their complaints and retaining outside counsel; this act ultimately led to Barnwell's suspension and subsequent dismissal; upper management was notably displeased with this turn of events; and, following Barnwell's dismissal, the SSUPD was restructured to eliminate only Plaintiff and Brown's positions based on Lawton and Hayes's recommendations—both of whom who knew about Plaintiff's involvement. See Jenkins v. Nell, 26 F.4th 1243, 1250 (11th Cir. 2022) ("A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) "systematically better treatment of similarly situated employees," and (3) pretext.").

Besides broadly citing budgetary reasons for the elimination of Plaintiff's position, Defendant has failed to refute Plaintiff's showing of pretext under these suspect circumstances or show why Plaintiff and Brown's positions were targeted in the RIF. See Harris v. Jackson, No. 1:19-CV-5849-MLB-JKL, 2022 WL 5240396, at *24–25 (N.D. Ga. July 18, 2022), *report and*

*recommendation adopted as modified*, No. 1:19-CV-5849-MLB, 2022 WL 4596343 (N.D. Ga. Sept. 30, 2022) (finding that while the defendant had offered a legitimate reason for the need for staffing transfers, it failed to give a legitimate and non-discriminatory reason for the need to transfer plaintiff specifically); accord Guzzo v. Queen of Angels Sch., No. 05-933, 2007 WL 712122, at * 3 (W.D. Pa. Mar. 7, 2007) (noting that while reduction in force is a legitimate, non-discriminatory reason, "the issue is why these two [individuals] were singled out for termination"). In light of the timeline, the fact that Plaintiff and Brown were apparently the only employees who played a role in Barnwell's dismissal and were thereafter the only employees who lost their jobs, and that Jolley had already implied that Plaintiff and Brown would lose their jobs in the restructuring as a result of their involvement, the Court finds there is sufficient circumstantial evidence for a reasonable jury to find Defendant's restructuring of the SSUPD was merely pretext for its discriminatory retaliation against Plaintiff.

## CONCLUSION

For the forgoing reasons, the Court **DENIES** Defendant Board of Regents' Motion for Summary Judgment.  (Doc. 29.)

**SO ORDERED**, this 25th day of May, 2023.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA